UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KQUAMAINE WINTERS,

Plaintiff,

-v- 1:23-CV-1355 (DNH/DJS)

SCHENECTADY CITY
SCHOOL DISTRICT,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES: OF COUNSEL:

KQUAMAINE WINTERS
Plaintiff, Pro Se
36 Swan Street
Schenectady, NY 12307

MAYNARD, O'CONNOR SMITH & CATALINOTTO — KELLY ANN KLINE, ESQ
Attorneys for Defendant
4 Tower Place, 3rd Floor
Albany, NY 12203

DAVID N. HURD
United States District Judge

## DECISION & ORDER

## I. INTRODUCTION

On October 31, 2023, *pro se* plaintiff Kquamaine Winters ("plaintiff"), a former employee of defendant Schenectady City School District ("defendant"),

filed this civil rights action alleging that defendant violated his rights under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL"). Dkt. No. 1. After defendant moved to dismiss the pleading, Dkt. No. 15, plaintiff filed a response in opposition, Dkt. No. 25, which the Court construed as an amended complaint, Dkt. No. 30.

On May 21, 2024, the Clerk of the Court docketed the amended complaint as the operative pleading. Dkt. No. 31. So construed, plaintiff's nine-count amended complaint asserted Title VII and NYSHRL claims for race and national origin discrimination, a hostile work environment, and retaliation. *Id.* Plaintiff's amended complaint also asserted race-discrimination-based claims under 42 U.S.C. § 1981. *Id.*

On June 4, 2024, defendant renewed its motion to dismiss, this time against the amended complaint. Dkt. No. 34. After briefing, Dkt. Nos. 43, 44, 46, the Court granted in part and denied in part defendant's motion, dismissing most of plaintiff's civil rights claims. Dkt. No. 47. As relevant here, however, the Court concluded that plaintiff had plausibly alleged claims under Title VII and the NYSHRL for: (1) disparate treatment; and (2) retaliation. *Id.*

On January 1, 2025, defendant answered those claims, Dkt. No. 50, and the parties began a period of discovery. *See, e.g.*, Dkt. Nos. 61, 62, 64, 79, 80. In the midst of this discovery period, U.S. Magistrate Judge Daniel J. Stewart did yeoman's work to help the parties settle this matter, taking the unusual

step of appointing counsel to plaintiff for this purpose.[1] *See* Dkt. No. 88. Unfortunately, this attempt at a negotiated resolution proved fruitless. So the parties completed discovery. *See* Dkt. No. 100.

On June 22, 2026, defendant moved for summary judgment on plaintiff's remaining claims. Dkt. No. 101. Plaintiff received multiple extensions of time in which to respond, Dkt. Nos. 106, 108, and then filed a 115-page opposition submission, Dkt. No. 109. Thereafter, defendant replied.[2] Dkt. No. 111.

The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. <u>BACKGROUND</u>

The following facts are taken from a comparison of defendant's statement of material facts, Dkt. No. 101-9 ("Def.'s Facts"), with plaintiff's response in opposition, Dkt. No. 109 at 4–9 ("Pl.'s Resp."). They are undisputed in relevant part unless otherwise noted.

On February 21, 2019, defendant hired plaintiff, who is African-American. Def.'s Facts ¶ 1; *see also* Am. Compl. ¶¶ 15, 20, 24. Plaintiff was appointed to the job of "full-time Cleaner" on September 25, 2019, and assigned a 2:30

[1] Court-appointed counsel is a limited resource not often expended under these circumstances.

[2] After briefing was closed, plaintiff filed letter motions seeking leave to file additional submissions, Dkt. Nos. 114, 119, which defendant has opposed, Dkt. Nos. 115, 120. More recently, plaintiff has filed a "status report" indicating that he plans to file more documents, Dkt. No. 122, which defendant has opposed, Dkt. No. 123. These filings will be addressed briefly *infra*.

p.m. to 11:00 p.m. shift. Def.'s Facts ¶ 1. Plaintiff encountered no issues during the first few months of his employment. *Id.* ¶ 2. However, thanks to society's collective response to the COVID-19 pandemic, plaintiff (along with a bunch of other workers employed by defendant) was laid off on October 28, 2020. *Id.*

On February 16, 2021, defendant sent a "recall letter" stating that plaintiff could be rehired to the position of Cleaner and that defendant had a Cleaner position available at that time. Def.'s Facts ¶ 3. This letter directed plaintiff to indicate whether he wanted to accept the job and instructed him to return the form no later than February 23, 2021. *Id.* Plaintiff, for his part, admits that the letter says these things but denies that he received it. Pl.'s Resp. ¶ 3.

Either way, plaintiff did not respond to the letter. Def.'s Facts ¶ 4. Soon thereafter, someone in defendant's Human Resources ("HR") Department telephoned plaintiff to see if he planned to return to work. *Id.* According to defendant, plaintiff "discussed returning to work but ultimately advised the HR employee that he would get back to him and never responded." *Id.* Plaintiff, for his part, admits that this conversation occurred but claims that he told the HR employee that his father had died, that he was busy with funeral arrangements, and that he wanted to return to work. Pl.'s Resp. ¶ 4.

In September of 2021, the new school year began. Def.'s Facts ¶ 5. At that time, plaintiff contacted his supervisor seeking to return to his original

assignment. *Id.* The supervisor explained to plaintiff that the assignment had already been filled, but that he could return to work as a Cleaner on a different shift at the same work location. *Id.* Plaintiff declined. *Id.* Plaintiff "admit[s] in part and den[ies] in part" this paragraph of defendant's statement of material facts, but it is unclear why. Pl.'s Resp. ¶ 5.

A few months later, on December 29, 2021, plaintiff filed a union grievance claiming that defendant had not recalled him to work. Def.'s Facts ¶ 6; *see also* Dkt. No. 101-4 at 51. After the HR department rejected the grievance, the parties held a meeting on January 6, 2022. Def.'s Facts ¶ 7. At that time, plaintiff accepted the Cleaner position that his supervisor had offered him when he tried to return at the start of the new school year—at the same work location but in a different time slot. *Id.* ¶¶ 2, 7; *see also* Pl.'s Resp. ¶ 7.

Even so, plaintiff continued to assert that he had a right under the relevant collective bargaining agreement ("CBA") to be recalled to the exact same work location and shift from which he had been laid off during COVID. *See* Dkt. No. 101-4 at 54. So the union grievance process continued to churn its way toward a formal resolution.

On March 24, 2022, defendant issued a "Step 2 Grievance Decision." Def.'s Facts ¶ 7; *see also* Dkt. No. 101-4 at 53–55. Among other things, this written decision summarized the relevant issue as follows:

On February 16, 2021, a letter was mailed to Mr. Winters indicating that the District was recalling individuals to the position of cleaner. Mr. Winters did not respond to the letter. Of the 19 cleaners laid off, seven either declined, failed to respond, or accepted a different position. The remaining 12 were recalled with dates ranging from 11/9/2020 to 3/1/2021. An employee with Human Resources called Mr. Winters and spoke to him on the telephone. The notes next to Mr. Winters name made by the employee state: "Letter sent, phone call made. He said he would let me know and never responded."

Mr. Winters acknowledged the phone call and indicated that he was unable to accept a cleaner position at that time (February 2021) because his father passed away and he needed to make funeral arrangements. In September 2021, after the start of the new school year, Mr. Winters attempted to reach back out to his supervisor to inquire about getting a cleaner position back with his original assignment. Sometime thereafter, Mr. Winters was advised that work location and shift he had at the time of the layoff (2:30 pm – 11:00 pm shift at the Schenectady High School) was not available, but the District could offer him a cleaner position at the high school with a shift of 10:00am – 6:30pm. It is undisputed that Mr. Winters failed to accept the offer because he was only interested in the cleaner position if he got the work location and shift he had when he was reduced.

On December 29, 2021, Mr. Winters filed the instant grievance and claimed that he had "not been recalled follow a reduction in force due to a district-wide layoff." On January 6, 2022, a meeting was held to discuss the grievance. Mr. Winters was offered a cleaned position at the Schenectady high school with a shift of 11:00 am – 7:30 pm [FN: later changed by a half-hour]. In accordance with the CBA 9.6.2, because the shift begins after 10:30 am, the entire shift assignment is eligible for a shift differential (the same differential that he was receiving when he was laid off). On the advice of his union representative, he accepted the offer. The Step 1 Decision rejected the grievance and noted that Mr. Winters has been offered a position as a cleaner. This appeal ensured. Mr. Winters continues to request that he be appointed "to his previous work assignment . . . and to be made whole."

> On Thursday, March 17, 2022, we met to discuss Mr. Winters grievance. Present at the meeting was Mr. Winters [and others]. Despite accepting a position of cleaner at his original work location, Mr. Winters continues to assert that he has the right to be recalled to the exact work location and shift he had when he was laid off . . . and the right to displace any less senior workers in that exact assignment.
>
> . . . .
>
> I do not find that Mr. Winters is aggrieved. He was offered the position of cleaner at least two times and he declined. As a result of the grievance and at the urging of his [union] representatives, Mr. Winters accepted a cleaner position at the high school, and recommenced employment on January 7, 2022. The position happened to be at his prior work location. The shift also happened to have a differential associated with it. Mr. Winters was not entitled to either of those things, but he was offered both nonetheless. Mr. Winters also had his seniority restored, and received a pro-rated amount of annual sick and vacation leave (a benefit not conferred on new employees). Thus Mr. Winters cannot argue that he is financially or otherwise aggrieved. He had the right to be recalled to a cleaner position to which he has already been re-appointed.
>
> Accordingly, the grievance is denied.

Dkt. No. 101-4 at 53–55. Thereafter, a "Step 3 Grievance Determination" also denied plaintiff's grievance. *Id.* at 56–59. In short, the CBA established that plaintiff was entitled to be recalled but not to his exact prior assignment.

In the meantime, on April 8, 2022, plaintiff filed another grievance related to a change in his salary step placement. Dkt. No. 101-5 at 85. This grievance was also denied at "Step 1" because the change in salary was consistent with a new agreement between defendant and the union. *See* Dkt. No.

101-5 at 44. As the later, "Step 2 Grievance Decision" on this issue endeavored to explain:

> On December 30, 2021, the District and the O&M [Operations and Maintenance] unit entered into a Memorandum of Agreement ("MOA") modifying the existing CBA which was set to expire on June 30, 2022 to extend the term until June 30, 2026 (Exhibit "B"). The MOA also provided for significant adjustments to salary schedules and reflected additional understandings between the parties. The prior CBA had 11 steps and 10 schedules (5 each for Operations and Maintenance), and divided employees into two groups – those hired on or after 7/1/2017 and those hired before. The December 30, 2021 MOA collapsed the 11 steps into 7 steps, reduced the number of schedules from 10 to 9 and removed the hiring date as a determinant for salary placement. The result was salary increases for the unit which ranged from approximately 4% to 20%.
>
> . . . .
>
> As of the date of the MOA, Mr. Winters was not employed by the District however, Step 2 had a salary of $26,000. When Mr. Winters was rehired on January 7, 2022, his salary was set at $27,456 to comply with the new minimum wage requirements. Mr. Winters was part of a group whose salary was inadvertently set at Step 2 of the new salary scales in the MOA, $32,136. On April 8, 2022, Mr. Winters filed the instant grievance on behalf of himself and other members of the O&M unit alleging that "members above step 1 did not advance on the step schedule and were moved back to step 1 when the pay raises took place. Multiple other members in the O&M unit have been impacted as a result of moving members back to step 1." He requests to be made whole.
>
> . . . .
>
> The issue of calculating the proper salary step placement was confusing for employees due to the compression of the steps from 11 to 7. It was further compounded due to a transition of personnel in the business office . . . . The new salaries were set to take effect on February 1, 2022 (rather than July 1, 2022 as typically occurs).

> As a result of a clerical error in the payroll department, some individuals got contract letters dated February 3, 2022 setting forth their new salaries incorrectly [ ]. Mr. Winters was one of those individuals. As soon as the error was discovered corrected contract letters were issued on February 8, 2022. Unfortunately Mr. Winters did not get a corrected letter, nor was his salary corrected in the District's payroll system. This was due to the fact that Mr. Winters was not employed by the District at the time the MOA was negotiated and was not on the spreadsheet of employees whose salaries before and after the MOA were mapped as part of the negotiations. This salary error was not discovered until the filing of the grievance.
>
> . . . .
>
> Mr. Winters salary was incorrectly calculated. He was moved from Step 2 on the old scale to Step 2 on the new scale. The salaries of other members of the O&M unit who were similarly situated were corrected to comport with the MOA and were placed at Step 1. Placement at Step 1 would give Mr. Winters an increase of at least 3%, plus 1%, which is the next highest above that calculation. In Mr. Winters case, he was among a group that received the most generous raises in the contract negotiation – 20% in his particular circumstance, a tribute to the selflessness of the more senior members of the unit, and a recognition of the valuable contributions the newer younger members make.
>
> Accordingly, the grievance is denied.

Dkt. No. 101-5 at 43–45; *see also* Def.'s Facts ¶¶ 8 –12; Pl.'s Resp. ¶¶ 8–12.

Plaintiff filed additional grievances related to overtime (June 13, 2022) and step raises (July 19, 2022). Def.'s Facts ¶¶ 14, 16. The exact fate of those grievance is unclear from the record, but as discussed *infra*, these additional filings certainly count as "protected activity."

During the period of time after his return to work, defendant claims that plaintiff "had repeated issues with work performance, timeliness, attendance, insubordination, and neglect of duties." Def.'s Facts ¶ 18. Plaintiff, for his part, says that "he did not remember being late and could not confirm the alleged dates," "did not leave work early without informing a manager or in an emergency," and "first heard the misconduct/insubordination charge on the day he was fired." Pl.'s Resp. ¶ 18.

On July 22, 2022, defendant sent plaintiff a letter entitled "Notice of Charges & Hearing." Dkt. No. 101-4 at 24–27. This letter explained that defendant sought plaintiff's termination under the CBA for "misconduct and insubordination and neglect of duty and incompetence." *Id.* at 24. This letter set forth a litany of instances in which plaintiff had allegedly engaged in misconduct. *Id.* at 24–27. Plaintiff, for his part, "disputes the generalized tardiness and early-departure assertions" and asserts "that he first learned of the insubordination charge when he was fired." Pl.'s Resp. ¶ 19.

In any event, plaintiff was terminated that day. Def.'s Facts ¶ 20. Thereafter, plaintiff filed an administrative charge with the U.S. Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("DHR"). *Id.* ¶¶ 22, 23. On July 9, 2023, the DHR issued a "no probable cause" determination. *Id.* ¶ 23. On August 1, 2023, the EEOC issued a right-to-sue letter. *Id.* ¶ 22. This action followed.

## III. LEGAL STANDARD

The entry of summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In conducting this analysis, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Id.* at 255. But there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## IV. DISCUSSION

As an initial matter, plaintiff is *pro se*. That means he is not represented by a lawyer. Thus, his filings must be held to less stringent standards than pleadings drafted by an attorney. *Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). As the Second Circuit has repeatedly explained, *pro se* filings must be "construed liberally" with "special solicitude" and interpreted to raise the strongest claims that they suggest. *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013). "This is particularly so when the *pro se* plaintiff alleges that her

civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

This leads to a second, related matter: how should plaintiff's letter motions and "status report" be handled? Recall that after briefing was closed, plaintiff filed a "request for leave and instructions to submit native audio evidence and supplemental declaration." Dkt. No. 114. Defendant opposed, pointing out that plaintiff had received multiple extensions of the summary judgment deadline and had filed "extensive opposition papers." Dkt. No. 115. In defendant's view, permitting plaintiff to improperly expand the summary judgment record with an unpermitted sur-reply would prejudice them. *Id.*

The Court left plaintiff's letter motion and defendant's response pending, since it planned to address the request in connection with the underlying summary judgment motion, which was already fully briefed. But plaintiff was not content to wait for the Court to rule on his new request. Instead, plaintiff filed a new letter motion: a "request for leave to file a limited consolidated response and proposed consolidated response to defendant's objections." Dkt. No. 119.

This time, presumably because he had read defendant's opposition to his first letter motion—where defendant pointed out the procedurally inappropriate nature of that request—plaintiff explains that since he cannot submit this paper as an "unauthorized additional merits brief," he would instead like to file it to "clarify portions of the existing discovery and summary-judgment

record." *Id.* Defendant again opposed, pointing out that plaintiff's renewed attempt to expand the discovery record is still just as procedurally improper and prejudicial as the first time that plaintiff attempted to do it. Dkt. No. 120.

Thereafter, plaintiff filed a "supplemental statement and request concerning the September 18, 2026 response deadline" in which he claims that "the Court directed Plaintiff to respond to Defendant's letter by September 18, 2026." Dkt. No. 121. But the Court did no such thing. Right after that, plaintiff filed a "status report" in which he stated that certain depositions have been completed, that official transcripts are not yet available, and that he seeks leave to submit deposition testimony after the official transcripts become available. Dkt. No. 122. Again, however, as defendant points out in an opposition to that filing, discovery in this action closed months ago, so the recently completed depositions to which plaintiff refers have nothing to do with the pending summary judgment motion. *See* Dkt. No. 123.

These kind of unwarranted, procedurally inappropriate submissions are a growing problem. In our judicial district, *pro se* litigants have historically been required to submit filings by mail or over the counter at one of the Clerk's Office locations unless they are granted permission to participate electronically using CM/ECF. *See* N.D.N.Y. L.R. 5.1(a); *see also* General Order 22, Section 12.1.

The rationale for this gatekeeping rule came from the obvious danger that a non-lawyer—who has no formal legal training and is not bound by the same ethical obligations that govern attorneys' conduct—might misuse the electronic filing system, either inadvertently (due to lack of an understanding about what is and is not procedurally appropriate) or perhaps intentionally (because they might be bad actors up to no good).

Plaintiff did not receive permission to participate in CM/ECF. Instead, plaintiff has been using a different document-filing system called "MFT." *See, e.g.*, Dkt. No. 57. Unlike CM/ECF, the MFT Portal requires no advance permission for a non-lawyer to participate. Accordingly, an MFT portal user is able to submit documents for filing even if they clearly run afoul of procedural or substantive requirements. [3]

This would be a tough problem to manage even if the filing system were reserved for lawyers. But these issues are magnified with *pro se* litigants, because the Court is always on the lookout for ways to reasonably accommodate

---

[3] The MFT portal is a Clerk's Office initiative that was spearheaded in response to perceived barriers that might limit litigants' access to the courts. The MFT portal has expanded to other novel uses (including for proposed sealed filings by attorneys), but the portal primarily operates as a method for pro se litigants to "electronically transmit documents to start a new case or to be filed in an existing case." The MFT portal seems to have made electronic filing—certainly anything that can be converted to a .pdf— a completely frictionless exercise for any *pro se* litigant who is armed with an internet-capable device. But the ease with which a *pro se* litigant can fire off MFT filings into the void make it much more challenging for the judicial side of the house to police ongoing litigation by applying the procedural requirements of our local and federal rules. To say nothing of litigants armed with a computer *and* a free-to-access generative artificial intelligence platform that produces plausible-sounding (but often incorrect and sometimes fabricated) responses to the information fed into it. Whatever other merits MFT might have, the Court is not convinced that it leads to better legal outcomes for the litigants involved in the actual legal disputes over which the district court presides.

them. Take this case. A review of the filings at issue show that plaintiff's use of the MFT system was clearly made in good faith. In other words, plaintiff's failure to follow certain procedural rules is clearly attributable to the kind of inadvertence that might trip up a non-lawyer rather than any kind of intentional misconduct.

Even so, plaintiff still filed a series of requests and a "status report" after briefing on the motion was closed. Before it can even get to the merits of the underlying motion, the Court has to do the extra work of untangling these additional filings in a way that is fair to *both* parties. To that end, the Court has reviewed plaintiff's additional filings and concludes that his requests to "supplement" the summary judgment record with belated filings are unwarranted and will be denied for two, related reasons.

First, plaintiff was on notice of our local rules. Dkt. No. 2. And he was explicitly cautioned about how to appropriately respond to a summary judgment motion. Dkt. No. 103. Second, after receiving extensions of time, plaintiff filed a 115-page opposition that is fully procedurally adequate for purposes of resisting summary judgment. Dkt. No. 109.

For instance, this opposition submission includes a procedurally appropriate submission entitled "plaintiff's response to defendant's statement of material facts pursuant to Local Rule 56.1." Dkt. No. 109 at 4–9. Plaintiff also filed an affidavit in opposition (albeit unsworn), *id.* at 10–12, filed his own

"statement of additional material facts," *id.* at 1–3, submitted a declaration in which he attached supporting exhibits, *id.* at 22–115, and includes a responsive memorandum of law, *id.* at 13–21.

Summary judgment is challenging enough to get right under ordinary circumstances. And *pro se* litigants often struggle to craft an appropriate responsive submission on summary judgment. This usually leads the reviewing court to take a substantive-over-form approach to what it has received in a given case.[4] But those concerns are vastly lessened here, since plaintiff filed a complete set of procedurally appropriate responsive submissions.

In sum, because there has been a fully adequate round of briefing that comports with standard motion practice, the Court refuses to permit plaintiff to further supplement his extensive filings after briefing on the matter has been closed.[5] *See, e.g.*, *Edward v. I.N.S.*, 59 F.3d 5, 8 (2d Cir. 1995) (cautioning

---

[4] This can sometimes mean looking at the underlying record (at least what has been made available on the docket) to determine if a genuine dispute of fact exists. *See, e.g.*, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (holding that district court "may in its discretion opt to conduct an assiduous review of the record"), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Importantly, however, Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (collecting cases). Instead, the reviewing court will typically focus its attention on the *pro se* litigant's incomplete or partial submissions and conduct a careful review of what has been offered to try to determine whether a trial might be warranted on any of the claims. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) ("In the case of a pro se, the district court should examine every claim or defense with a view to determining whether summary judgment is legally or factually appropriate.").

[5] The Court has also reviewed plaintiff's amended complaint, Dkt. No. 31, which, liberally construed, counts as a "verified" pleading. *See* 28 U.S.C. § 1746. In other words, the non-conclusory factual allegations in that document are tantamount to an affidavit to the extent that they are supported by personal knowledge.

that *pro se* status does not exempt litigant from procedural rules). Accordingly, plaintiff's letter requests (Dkt. Nos. 114, 119) are denied.

**A. Plaintiff's Discrimination Claims**

As noted *supra*, the Court dismissed all of plaintiff's claims except for his Title VII & NYSHRL claims for disparate treatment and retaliation. Dkt. No. 47. To the extent that plaintiff's opposition filings might be read to suggest an intent to resurrect one or more of the claims that were dismissed at the pre-answer stage, those claims remain dismissed. They will be not be discussed further.

**1. Title VII – Disparate Treatment**

Plaintiff alleged that he was treated differently than similarly situated employees with respect to, *inter alia*, his grievances surrounding overtime pay and disparate discipline for breaking defendant's attendance rules. Am. Compl. ¶¶ 6(a), (i). At the pre-answer stage, the Court concluded that plaintiff had identified at least one adverse employment action: his termination in July of 2022. Dkt. No. 47 at 17. Accordingly, the Court concluded that plaintiff had plausibly alleged a disparate treatment claim. *Id.*

Defendant argues that this claim must be dismissed on summary judgment because the record does not support an inference of discriminatory treatment. Dkt. No. 101-10 at 10. Even assuming otherwise, defendant contends it had legitimate, non-discriminatory reasons for any challenged actions. *Id.*

Liberally construed, plaintiff claims that defendant treated him less favorably than others because he is African-American. In other words, plaintiff claims "disparate treatment" based on his "race" or "national origin," which can be actionable if the defendant had a discriminatory intent or motive in taking the adverse employment-related action. *See, e.g.*, *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977 (1988).

An employer's discriminatory intent or motive can always be proven with direct evidence. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989). Direct evidence includes things like "a workplace policy, practice or decision [that] relies expressly on a protected characteristic," *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015), or through "conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude," *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992).

But an employer's intent and state of mind are "usually unstated." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015). So most discrimination cases rely on the force of indirect proof. *See Krul v. DeJoy*, 705 F. Supp. 3d 5, 40 (N.D.N.Y. 2023) (collecting cases); *Sublett v. John Wiley & Sons*, 463 F.3d 731, 736 –37 (7th Cir. 2006) (characterizing indirect method of proof as the "more common" approach to establishing Title VII claim).

At summary judgment, a plaintiff can establish a disparate treatment claim based on indirect evidence: (1) by showing that the employer's stated reason for the challenged employment action was actually a "pretext" to cover-up unlawful discrimination; or (2) "by otherwise creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination." *Vega*, 801 F.3d at 87.

A showing of "pretext" is the most common method for defeating summary judgment. To do so, the plaintiff must satisfy the evidentiary framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (distinguishing this evidentiary framework from party's burden of proof at trial).

Under this three-part burden-shifting framework, "(1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of 'discrimination *vel non*;' and thus, (3) the burden shifts back to the plaintiff 'to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Krul*, 705 F. Supp. 3d at 40 (cleaned up).

Plaintiff's briefing leaves the exact contours of his disparate treatment claim(s) somewhat unclear. In his opposition, plaintiff complains about three or four main events in the fact pattern that might qualify: the timing of his recall to employment (in his deposition, he mentions loss of back pay for this time period), the loss of union seniority that came with the timing of this re-hiring, the unfavorable salary adjustment that followed, and the legitimacy of defendant's ultimate decision to terminate him. *See* Dkt. No. 109 at 13–21.

Title VII disparate-treatment claims based on indirect evidence have a plaintiff-friendly "motivating factor" standard of causation. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 337 (2020). And recently, in a case called *Muldrow v. City of St. Louis, Missouri*, the Supreme Court held that a plaintiff is not required to meet any "heightened threshold of harm" in the disparate-treatment context. 601 U.S. 346, 353 (2024). Instead, a plaintiff only needs to show "*some* harm respecting an identifiable term or condition of employment." *Id.* (emphasis added). This means that under the right circumstances, non-economic and intangible harms can suffice. *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 (2d Cir. 2023).

Measured against this general legal standard, and viewed in the light most favorable to plaintiff, the non-movant here, the Court concludes that plaintiff has adequately identified various "harms" that might be actionable

under Title VII's expansive rubric.[6] The problem for plaintiff, however, is that there is insufficient evidence in the record from which a rational fact-finder might fairly conclude that plaintiff was the victim of intentional race or national origin discrimination in connection with any of these events.

In reaching that conclusion, the Court agrees wholeheartedly with plaintiff that the statements made by defendant or its agents in the written grievance determinations, and in the written termination letter that accuses him of various form of misconduct, should not be treated as gospel. That is, these statements do not necessarily establish the "truth" about any particular event that happened or did not happen.[7] *See, e.g.*, Pl.'s Resp. ¶¶ 20–21, 23–26.

But that does not mean those written determinations are completely irrelevant on summary judgment. At this stage of the case, those determinations are sufficient to satisfy defendant's intermediate burden of identifying legitimate, non-discriminatory reasons for each of the contested actions that were taken: plaintiff was not recalled immediately because he failed to follow-up

---

[6] Title VII imposes a 300-day timeliness requirement as to each discrete act or occurrence. 42 U.S.C. § 2000e-5(e)(1); *see also Duplan v. City of N.Y.*, 888 F.3d 612, 621 n.7 (2d Cir. 2018). Title VII also imposes an exhaustion requirement as a precondition to suit in federal court. 42 U.S.C. §§ 2000e-5(e),(f); *see also Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015). The parties do not engage with these issues, but plaintiff has received final letters from the EEOC and DHR. Accordingly, the Court assumes these requirements have been satisfied for the purpose of this motion practice.

[7] Notably, the Court quoted from the written determination at length in the Background section of this opinion not because these statements were necessarily true but because these documents provided important context for making sense of this dispute (for instance, compare the written grievance determination explaining the salary step issue with the parties' attempted explanation of that issue in the statement of material facts and plaintiff's response).

after HR called him; plaintiff's seniority was restored in accordance with the timing of that re-hiring; plaintiff's salary was later adjusted in accordance with a renegotiated CBA; and plaintiff was terminated for misconduct.

Where, as here, the defendant has produced a legitimate, non-discriminatory reason for a challenged action, then "the presumption raised by the prima facie case is rebutted and drops from the case." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (citation omitted). "At the final stage, the plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision—a burden that merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Id.* (cleaned up).

Plaintiff has not done so. For instance, plaintiff submitted a declaration in opposition in which he attempts to partially dispute one of the several forms of misconduct on which his termination was allegedly based. *See* Dkt. No. 109 at 11 ¶ 12 ("I do not recall being habitually late. I did not leave work early without notifying a manager."). But nowhere in his declaration does he offer any non-conclusory reason to think that intentional race or national origin discrimination was in any way, shape, or form a "motivating factor" for the adverse employment action(s) he suffered.

Elsewhere, plaintiff identifies a white co-worker named Tina Civitello who "received a thirty-day leave and more favorable time treatment." Dkt. No.

109 at 18. Again, however, this fact, standing alone or in combination with the rest of the record, is insufficient to raise any genuine dispute of fact regarding whether intentional race or national origin discrimination might have been a true reason for plaintiff's termination.

In light of his *pro se* status, the Court has also reviewed the rest of plaintiff's deposition. *See* Dkt. No. 101-7. That review leads to the same bottom-line conclusion: plaintiff has not marshaled evidence from which a rational factfinder could fairly conclude that plaintiff was a victim of intentional race or national origin discrimination in connection with his disparate treatment claims. Accordingly, plaintiff's Title VII disparate treatment claims must be dismissed.

**2. Title VII – Retaliation**

Plaintiff alleged that he was retaliated against by defendant when he was terminated from his position after filing union grievances. Am. Compl. ¶¶ 1, 28–31. At the pre-answer stage, the Court concluded that plaintiff had plausibly alleged that defendant retaliated against him in response to this protected activity, *e.g.*, he spoke with defendant's representatives at a disciplinary hearing and discussed his allegations of discrimination and retaliation. Dkt. No. 47 at 22. Accordingly, the Court concluded that plaintiff had plausibly alleged a retaliation claim. *Id.*

Defendant argues this claim must be dismissed on summary judgment because plaintiff has failed to establish a causal connection between his protected activity and his termination. Dkt. No. 101-10 at 13. But even assuming otherwise, defendant argues that the record establishes legitimate, non-retaliatory reasons for its decision to terminate plaintiff. *Id.*

Title VII prohibits retaliation against an employee who makes or supports a charge of discrimination. 42 U.S.C. § 2000e-3(a). This provision protects the substantive anti-discrimination component of the statute "by preventing an employer from interfering (through retaliation) with an employee's effort to secure or advance enforcement of [Title VII's] basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

A plaintiff can prove the employer's retaliatory animus with direct evidence. *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003). But as with direct evidence of discriminatory intent or motive, direct evidence of retaliatory animus is usually absent from the record. *See, e.g.*, *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992).

Thus, retaliation claims also tend to rely on the aggregated weight of circumstantial proof. *See, e.g.*, *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010). "This usually involves evidence that the protected activity was followed closely by discriminatory treatment or with a showing that other employees

who engaged in similar conduct were treated differently." *Krul*, 705 F. Supp. 3d at 59 (citation omitted).

At summary judgment, the sufficiency of a retaliation claim is analyzed with the same *McDonnell Douglas* three-step burden-shifting framework that applies to intentional discrimination claims based on indirect proof. *See, e.g.*, *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). In the retaliation context, "temporal proximity plays an important role in establishing indirect evidence of . . . retaliatory animus." *Krul*, 705 F. Supp. 3d at 63 (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).

Measured against this general legal standard, and even viewing the record in the light most favorable to plaintiff as the non-movant, there is insufficient evidence in this record from which a rational fact-finder could determine that retaliatory animus was a "but-for" cause of any of the events about which plaintiff complains. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2d Cir. 2013); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020) (cautioning courts not to lean too heavily on the traditional but-for causation requirement, since one event can have many causes).

In reaching this conclusion, it bears emphasizing that an individual engages in "protected activity" whenever he makes a good-faith complaint about something that he believes violates the law, "even if the practices or conditions were not actually unlawful." *Ringel v. N.Y. City Dep't of Educ.*, 616 F. Supp.

3d 205, 233 (E.D.N.Y. 2022) (cleaned up). In other words, plaintiff's union grievances and other complaints qualify as "protected activity" even if, as defendant points out, the NYSDHR later concluded otherwise. Def.'s Facts ¶ 26.

However, defendant's showing—as before—establishes that there were legitimate, non-discriminatory reasons for each of the actions about which plaintiff has complained. And for substantially the same reasons set forth *supra*, plaintiff has failed to identify evidence in this record from which a fact-finder could conclude that defendant's explanation for these actions was not legitimate and was instead a cover for the true reason: retaliatory animus.

Although temporal proximity "plays an important role in establishing indirect evidence of discriminatory or retaliatory animus, . . . . temporal proximity alone cannot bear *all* the weight in getting a circumstantial claim for retaliation over to trial." *Krul*, 705 F. Supp. 3d at 63 (cleaned up). Accordingly, plaintiff's Title VII retaliation claim must be dismissed.

**3. NYSHRL**

As noted *supra*, plaintiff's NYSHRL claims for disparate treatment and retaliation also survived pre-answer dismissal. Dkt. No. 47. Where, as here, all of the federal-law claims are going to be dismissed before trial, federal courts generally decline to exercise supplemental jurisdiction over any remaining state-law claims. *See, e.g.*, *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018).

Upon review, dismissal of plaintiff's state-law claims is the better course of action under these circumstances. Historically, Title VII and NYSHRL claims shared the same core substantive standards. *See, e.g.*, *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 391, 398 (S.D.N.Y. 2017). But recent state-law amendments to the NYSHRL might have impacted one or more of these claims in a way that might (or might not) be more favorable to plaintiff. Accordingly, plaintiff's state-law claims will be dismissed without prejudice so that he can renew them in a state forum if warranted. N.Y. C.P.L.R. § 205(a).

## IV. CONCLUSION

Viewed in the light most favorable to the non-movant, and even accounting for his *pro se* status, there is insufficient evidence in the available record from which a rational fact-finder could return a plaintiff's verdict on the remaining Title VII claims. However, plaintiff's NYSHRL claims will be dismissed without prejudice to refiling in an appropriate state-court forum.

Therefore, it is

ORDERED that

1. Defendant's (Dkt. No. 101) motion for summary judgment is GRANTED in part and DENIED in part;

2. Plaintiff's (Dkt. Nos. 114, 115, 119) letter motions are DENIED;

3. Defendant's (Dkt. No. 120) letter motion is DENIED as moot;

4. Plaintiff's amended complaint (Dkt. No. 31) is DISMISSED;

5. Plaintiff's Title VII claims are DISMISSED with prejudice; and

6. Plaintiff's NYSHRL claims are DISMISSED without prejudice.

The Clerk of the Court is directed to terminate the pending motions, enter a judgment accordingly, and close the file.

IT IS SO ORDERED.

Dated: November 23, 2026
Utica, New York.

David N. Hurd
U.S. District Judge